CALIFORNIA HEALTH FACILITIES AUTHORITY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6577-85B.        Filed May 2, 1988.

---

*Dean E. Criddle* and *Greg R. Riddle,* for the petitioner.
*L. Michael Wachtel,* for the respondent.

OPINION

WILLIAMS, *Judge:* * The Commissioner determined that certain obligations that petitioner proposes to issue would not be described in section 103(a).[1] Petitioner seeks a declaratory judgment of this Court pursuant to section 7478 that the proposed obligations will be described in section 103(a) with the result that interest paid on the obligations would be excludable from a bondholder's gross income.

This case was submitted on the stipulated administrative record pursuant to Rules 122[2] and 217(b). The facts and representations contained in the administrative record are assumed to be true. Rule 217(b)(1).

Petitioner is an authority created under the California Health Facilities Act[3] empowered to issue obligations on behalf of the State of California. Petitioner maintains its principal office at Sacramento, California.

Petitioner plans to issue bonds in one or more series pursuant to an indenture between petitioner and a corporate trustee. Petitioner will deposit the bond proceeds net of costs, capitalized interest, and a reserve fund with one or more banks or other financial institutions (the lenders)

---

*By order of the Chief Judge, this case was reassigned to Judge B. John Williams, Jr., for decision and opinion.

[1]Although the ruling that petitioner requested and which respondent denied pertained to bonds to be issued pursuant to the Internal Revenue Code of 1954, the parties have stipulated that, except for the matters at issue before the Court, the bonds to be issued will satisfy the requirements and restrictions of the Internal Revenue Code of 1986 as amended. Furthermore, the 1986 Code did not eliminate the issues controverted by the parties. Consequently, an actual case or controversy continues to exist between the parties. See sec. 7478(a). The House report on the bill that became the 1986 Code explains,

"The bill reorganizes and amends the present-law rules governing tax exemption for interest on obligations issued by or on behalf of qualified governmental units. As part of this reorganization, the present-law rules contained in Code sections 103 and 103A are divided, by topic, into 11 Code sections (secs. 103 and 141-150). The committee intends that, to the extent not amended, all principles of present law apply under the reorganized provisions. [H. Rept. 99-426, 99th Cong., 1st Sess. 518 (1985), 1986-3 C.B. (Vol. 2) 518; fn. refs. omitted.]"

Unless otherwise specified, all section references are to the Internal Revenue Code of 1986 as amended.

[2]All Rule references are to the Tax Court Rules of Practice and Procedure.

[3]Cal. Govt. Code sec. 15430 et seq. (West 1979 and Supp. 1987).

pursuant to one or more loan agreements (the lender loan agreement). The deposits are cast in the form of loans to the lenders and are general obligations of the lenders.

The lender loan agreement gives petitioner firm control over the use of the bond proceeds. The lenders must account for bond proceeds separately from their other funds and must use all bond proceeds to make loans to health care facilities (the hospitals) specified by petitioner. The hospitals will co-sign the lender loans. A bondholder could look to the lenders for repayment if petitioner were to default and to the hospitals if the lenders were to default.

The hospitals will be either (1) nonprofit corporations qualifying as exempt organizations pursuant to section 501(c)(3) or (2) governmental units. The hospital loan agreements will provide that the proceeds of the loans may be used only to finance, refinance, or reimburse the cost of constructing, acquiring, or installing capital improvements or equipment at the hospitals. At least 95 percent of the net proceeds (proceeds less reasonably required reserve or replacement funds) of each bond issue will be used solely for the exempt purpose of "hospitals" as that term is used in section 145(b) and will not be used either directly or indirectly in any "unrelated trade or business" within the meaning of section 513(a). "Issuance costs" financed by each bond issue will not exceed 2 percent of the aggregate face amount of the bond issues as required by section 147(g)(1)[4] and will be allocated to the 5-percent "bad money" portion of the bond proceeds. See H. Rept. 99-841 (Conf.), at II-729 (1986), 1986-3 C.B. (Vol. 4) 729.[5] The "issuance costs" will not include the lenders' compensation.

---

[4]Sec. 147(g)(1) provides:

SEC. 147(g). RESTRICTION ON ISSUANCE COSTS FINANCED BY ISSUE.—

(1) IN GENERAL.—A private activity bond shall not be a qualified bond if the issuance costs financed by the issue (of which such bond is a part) exceed 2 percent of the aggregate face amount of the issue.

[5]The Conference report states that, "as is true of other private activity bonds, costs of issuance are not treated as spent for the exempt purpose of the borrowing." H. Rept. 99-841 (Conf.), at II-726 (1986), 1986-3 C.B. (Vol. 4) 726. The report further explains:

"The conference agreement requires that at least 95 percent of the net proceeds of all issues of private activity bonds be used for the exempt purpose of the borrowing. * * * Net proceeds is defined as the proceeds of the issue minus amounts invested in a reasonably required reserve or replacement fund. Thus, amounts used to pay any costs of issuance must be paid from the so-called 5 percent 'bad money' portion of an issue. [H. Rept. 99-841 (Conf.), *supra* at II-729, 1986 C.B. (Vol. 2) at 729. Fn. ref. omitted.]"

In addition, the parties agree that all other relevant requirements applicable to private activity bonds set forth in section 147 will be satisfied.

Petitioner will issue two separate series of bonds. "Issue A" bonds will be issued in the principal amount of approximately $40 million to finance the acquisition and construction of new health care facilities by a single hospital described in section 501(c)(3). Issue A will consist of serial and term bonds and will have a final term to maturity not exceeding 35 years. "Issue B" bonds will be issued in the principal amount of approximately $30 million to provide a pool of funds to finance the acquisition of health care equipment by hospitals that apply to petitioner during a period ending approximately 2½ years after the date of issuance of the Issue B bonds. Issue B will consist of term bonds having a final term to maturity of approximately 7 years. All bonds issued will be in registered form but will not be federally guaranteed. See sec. 149(a), (b). Petitioner will satisfy the information reporting requirements of section 149(e). Any management agreements or other operating contracts entered into with organizations not described in section 501(c)(3) will meet the operating guidelines set forth in Rev. Proc. 82-14, 1982-1 C.B. 459, and Rev. Proc. 82-15, 1982-1 C.B. 460, as modified pursuant to section 1301(e) of the 1986 Act.[6]

Petitioner filed its ruling request on June 15, 1983. After extensive correspondence, respondent issued a favorable letter ruling on February 27, 1984, concluding that interest on the bonds was excludable from gross income under section 103(a). On May 10, 1984, however, before petitioner

---

[6]Sec. 1301(e) of the 1986 Act provides:

SEC. 1301(e). MANAGEMENT CONTRACTS.—The Secretary of the Treasury or his delegate shall modify the Secretary's advance ruling guidelines relating to when use of property pursuant to a management contract is not considered a trade or business use by a private person for purposes of section 141(a) of the Internal Revenue Code of 1986 to provide that use pursuant to a management contract generally shall not be treated as trade or business use as long as—

    (1) the term of such contract (including renewal options) does not exceed 5 years,

    (2) the exempt owner has the option to cancel such contract at the end of any 3-year period,

    (3) the manager under the contract is not compensated (in whole or in part) on the basis of a share of net profits, and

    (4) at least 50 percent of the annual compensation of the manager under such contract is based on a periodic fixed fee.

Pub. L. 99-514, 100 Stat. 2655.

had issued bonds in reliance on the ruling, respondent revoked his letter ruling of February 27, 1984.[7] On December 17, 1984, respondent issued a letter ruling concluding that the proposed bonds would not be described in section 103(a). Petitioner timely filed its petition seeking declaratory relief on March 21, 1985.[8]

Section 103(a), as amended by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085 (the 1986 Act), provides an exclusion from gross income for interest on State and local bonds. Section 103(b) sets forth three exceptions: (1) Private activity bonds that are not "qualified bonds;" (2) "arbitrage bonds;" or (3) "registration-required bonds" that are not in registered form. Respondent contends that petitioner's proposed bonds are (1) private activity bonds that are not "qualified bonds" and (2) arbitrage bonds.

We first consider whether, as respondent contends, the bonds are private activity bonds not described in section 103(a). Petitioner concedes that the bonds will be private activity bonds within the meaning of section 141[9] because bond proceeds will be used to finance loans to hospitals, many of which are expected not to be governmental units. Petitioner argues, however, that the bonds will nonetheless

---

[7] See sec. 601.201(1)(4), Statement of Procedural Rules.

[8] The petition was timely mailed on Mar. 15, 1985. See sec. 7502.

[9] Sec. 141 provides in relevant part:

SEC. 141. PRIVATE ACTIVITY BOND; QUALIFIED BOND.

(a) PRIVATE ACTIVITY BOND.—For purposes of this title, the term "private activity bond" means any bond issued as part of an issue—

    (1) which meets—

        (A) the private business use test of paragraph (1) of subsection (b), and

        (B) the private security or payment test of paragraph (2) of subsection (b), or

    (2) which meets the private loan financing test of subsection (c).

(b) PRIVATE BUSINESS TESTS.—

    \*      \*      \*      \*      \*      \*      \*

    (9) Exception for qualified 501(c)(3) bonds.—There shall not be taken into account under this subsection or subsection (c) the portion of the proceeds of an issue which (if issued as a separate issue) would be treated as a qualified 501(c)(3) bond if the issuer elects to treat such portion as a qualified 501(c)(3) bond.

    \*      \*      \*      \*      \*      \*      \*

(d) QUALIFIED BOND.—For purposes of this part, the term "qualified bond" means any private activity bond if—

    (1) IN GENERAL.—Such bond is—

    \*      \*      \*      \*      \*      \*      \*

        (G) a qualified 501(c)(3) bond.

be described in section 103(a) because they will be "qualified 501(c)(3) bonds" within the meaning of sections 141(b)(9) and 145.

## Qualified Section 501(c)(3) Bonds

Petitioner argues that regardless of whether the bonds in issue satisfy the private business-use test, they are nonetheless exempt from tax as bonds described in section 103(a) because they are "qualified 501(c)(3) bonds." Section 141(b)(9) excepts from the private business-use test and the private security or payment test "the portion of the proceeds of an issue which (if issued as a separate issue) would be treated as a *qualified 501(c)(3) bond.*" (Emphasis added.) Section 145(a)[10] defines a "qualified 501(c)(3) bond" as a private activity bond issued as part of an issue if, first, all property provided by the net proceeds of the issue, in this case the improvements made by the hospitals who receive loans, will be owned by a governmental unit or section 501(c)(3) organization. The lender loan agreement specifies that only hospitals that are governmental units or section 501(c)(3) organizations are eligible for the hospital loans and this requirement will, therefore, be satisfied. See sec. 145(a)(1). The second part of the definition requires us to determine that the bonds would not be private activity bonds if the hospitals were to be treated as governmental units with respect to their exempt activities. Respondent does not contend that petitioner fails to satisfy this requirement, and we can find no evidence in the record to support such a contention. Finally, section 145(a)(2)(B) requires us to apply the private business-use test and the private security or payment test with certain amendments.

---

[10]Sec. 145(a) defines a "qualified 501(c)(3) bond" as follows:

SEC. 145. QUALIFIED 501(c)(3) BOND.

(a) IN GENERAL.—For purposes of this part, except as otherwise provided in this section, the term "qualified 501(c)(3) bond" means any private activity bond issued as part of an issue if—

(1) all property which is to be provided by the net proceeds of the issue is to be owned by a 501(c)(3) organization or a governmental unit, and

(2) such bond would not be a private activity bond if—

(A) 501(c)(3) organizations were treated as governmental units with respect to their activities which do not constitute unrelated trades or businesses, determined by applying section 513(a), and

(B) paragraphs (1) and (2) of section 141(b) were applied by substituting "5 percent" for "10 percent" each place it appears and by substituting "net proceeds" for "proceeds" each place it appears.

Respondent contends that petitioner's bonds will not be "qualified bonds" because they will be used in the lenders' trade or business. If we conclude that the bond proceeds will be used in the lenders' trade or business, the bonds will not be described in section 103(a) because the private business-use test of section 145(a)(2) will be met. Respondent's position is grounded on his view of the lenders' role in the bond transactions. Respondent perceives the lenders to be beneficiaries of the bond proceeds who act as independent parties using the bond proceeds to make loans for their own accounts. Because of the significant restrictions placed on the lenders' functions and activities by the lender loan agreement, however, we conclude that the lenders are conduits for the bond proceeds to the ultimate beneficiaries, i.e., the hospitals.

The lenders' authority over the bond proceeds is the equivalent of an agent employed by petitioner to promote an efficient distribution of bond proceeds to the hospitals. The lenders must account separately for the bond proceeds held by them and must use the proceeds exclusively to make loans to those hospitals specified by petitioner. Petitioner will also specify the principal amount, interest rate, term, and all other provisions required by the indenture and the lender loan agreement. Petitioner will specify the loan eligibility standards. The lenders must apply their customary underwriting standards and may refuse to make a loan after examination of the credit worthiness of a hospital specified by petitioner, subject to prior consultation with petitioner. To the extent that loans are not made within a specified period, the lenders must repay the unspent proceeds, and petitioner must use those funds to redeem bonds. The lenders thus will use the net bond proceeds as agents of petitioner to facilitate the hospital loans.

Petitioner has the option to purchase any hospital loan from any lender at any time by paying the unpaid principal amount plus accrued interest and any prepayment penalty. The lenders may not sell or otherwise dispose of the loans to any other person or entity without express written authorization from petitioner, and the proceeds of any such

sale must be used by the lenders to repay their obligation to petitioner under the lender loan agreement.

The lenders' role in credit support of the bonds is substantially similar to that of the writer of a direct pay letter of credit which is assigned to a trustee for the benefit of the bondholders. We view the lenders' unconditional obligation to pay petitioner as the equivalent of lending their credit status to petitioner to guarantee the bonds. The lenders are obligated to repay the loan from petitioner regardless of whether the hospital loans are in default. The lenders' status as obligors is principally to provide necessary credit support for the bond issue, as if they had issued letters of credit which were drawn down to make the payments on the bonds.

The lenders may not charge fees, bonuses, or premiums, commonly referred to as points (other than the "program fee" discussed below) but may charge the hospitals reasonable fees and expenses customarily charged in the area in connection with origination of similar loans. The fees and expenses may include application fees, appraisal fees, escrow fees, inspection fees, credit report fees, engineering fees, fees or premiums for title examination or title insurance, document preparation fees, and such other fees as petitioner may expressly authorize.

The lenders will be compensated for making and servicing loans and providing credit support for the bonds primarily by charging a "program fee" as a percentage of the loan to be divided between the lender and petitioner and by the difference between the payments due on the loans and the payments that the lenders are required to make to petitioner. The program fee will not exceed 1½ percentage points of the original principal amount of a hospital loan. The interest charged on the hospital loans cannot exceed the interest on petitioner's loans to the lenders by more than 1¾ percentage points. The amount charged by the lender will be an arm's-length rate not in excess of amounts charged by financial institutions generally in connection with similar loans. Hospitals seeking financing from lenders not participating in petitioner's bond program would incur additional costs for insurance from the Federal Deposit

Insurance Corporation or Federal Savings and Loan Insurance Corporation and for reserve requirements.

We conclude that the lenders' contractual obligations to petitioner are sufficient to preclude a finding that they will use the bond proceeds in a separate trade or business. We agree with respondent's initial view of this matter which formed the basis for his favorable letter ruling to petitioner dated February 27, 1984:

> The program is designed to make credit available to Hospitals at terms not otherwise offered by Lenders and to provide financing for Hospitals not qualified for loans from Lenders based on customary lending practices. The restrictions placed on the Lenders' role in the Program preclude the Lenders from exercising discretionary control over the loans or sharing in the profits and losses from the operation of bond-financed facilities. The Lenders will serve as conduits for bond proceeds and as providers of services rather than as active participants in the program or as proprietors of bond-financed facilities. The Lenders will thus act as agents of Authority, and will not be users of any bond-financed facilities (the Projects) in a trade or business.

There are, however, elements of petitioner's proposed bond transaction that point to an opposite conclusion. First, the lenders are entitled to collect a prepayment penalty in the event of prepayment by a hospital or if petitioner elects to purchase any hospital loan from a lender.[11] Second, the lenders are entitled to a portion of the program fee collected from the hospitals at closing on the hospital loans and, in addition, may charge an interest rate on their hospital loans up to $1\frac{3}{4}$ percent in excess of that charged on their loans from petitioner. Both of these elements are compensation to lenders normally received by financial lending institutions on loans to borrowers and these factors suggest that the loans are being made to the lenders for their own benefit. The record, however, does not provide any basis for concluding that this compensation is greater than that which would be received by the lenders acting as agents of petitioner for their credit support of petitioners bonds.[12] In spite of these negative factors, we conclude that the restrictions and controls under the lender agreements outweigh the negative points and assure that the hospitals will

---

[11]The record does not indicate the amount of the prepayment penalty, but respondent does not contend that it is commercially unreasonable.

[12]Indeed, the record suggests the contrary. See note 13 *infra*.

be the only "users" of the bond proceeds within the meaning of section 141(b)(6). The lenders do not "use" the bond proceeds in their businesses principally because (1) the proceeds are designated and separately accounted for; (2) their use is restricted to hospitals selected by petitioner, and unused funds are returned to redeem bonds; (3) the terms of the loans are set by petitioner; and (4) the loans cannot be sold by the lenders without petitioner's consent. The lenders' function is thus twofold: (1) To provide normal lending services on behalf of petitioner and the hospitals, and (2) to enhance security to the bondholders. The lenders' interest in bond proceeds is compensatory and appears to be restricted to reasonable compensation for performing their functions. Consequently, the bonds will be qualified section 501(c)(3) bonds pursuant to section 145.

### Arbitrage Bonds

Interest on the bonds nonetheless may be taxable if the bonds are arbitrage bonds within the meaning of section 148. Sec. 103(b)(2). Section 148 defines an arbitrage bond as follows:

SEC. 148. ARBITRAGE.

(a) ARBITRAGE BOND DEFINED.—For purposes of section 103, the term "arbitrage bond" means any bond issued as part of an issue any portion of the proceeds of which are reasonably expected (at the time of issuance of the bond) to be used directly or indirectly—

    (1) to acquire higher yielding investments, or

    (2) to replace funds which were used directly or indirectly to acquire higher yielding investments.

For purposes of this subsection, a bond shall be treated as an arbitrage bond if the issuer intentionally uses any portion of the proceeds of the issue of which such bond is a part in a manner described in paragraph (1) or (2).

A "higher yielding" investment is any investment property that produces a "materially higher" yield over the term of the issue than the yield on the issue. Sec. 148(b)(1). In this case, the bonds to be issued are the "issue," and in respondent's view, the "investment property" is the hospital loans.

Yield is determined based on the issue price of the obligation. Sec. 148(h). The yield produced by an acquired

obligation is materially higher than the yield on the issue if "the yield produced by the acquired obligations exceeds the yield produced by the issue of governmental obligations by more than * * * one-eighth of one percentage point." Sec. 1.103-13(b)(5)(i), Income Tax Regs. In determining the yield on an acquired obligation, administrative costs such as the cost of issuing, carrying, or repaying the issue, the underwriter's spread and the cost of purchasing, carrying, and selling or redeeming the acquired obligation are not taken into account. Sec. 1.103-13(c)(5)(i), (iv), Income Tax Regs.

The parties have stipulated that on the date of issuance of the bonds, petitioner will certify in good faith that it reasonably expects that the bond proceeds will not be used directly or indirectly to acquire higher yielding investments or to replace funds which were used or will be used directly or indirectly to acquire higher yielding investments which are prohibited by section 148(a), except as otherwise permitted by section 148. Further, petitioner will not intentionally use any portion of the proceeds of the bond issue in a manner described in section 148(a). Section 148(d)(1) provides that an amount not in excess of 10 percent of the proceeds of the bond issue may be invested in a higher yielding investment if that investment is part of a reasonably required reserve or replacement fund. The parties agree that the bond issue will satisfy this requirement. In addition, petitioner's bond issue will comply with the rebate requirements of section 148(f).

The fees and expenses charged by the lenders for appraisal fees, application fees, escrow fees, title fees, and insurance, etc., are administrative costs. Respondent argues, however, that the "credit support" fees that the lenders will charge the hospitals should be viewed as interest and not administrative expenses because their sole purpose will be to recompense the lenders for assuming the risk that the hospitals may default on their obligations. The "credit support" fees are the "program fee" and the interest differential charged by the lenders on the loans to the hospitals. Respondent reasons that only specifically identifiable costs may be allocated to administrative costs with the remainder allocated to interest.

Respondent's argument is again grounded on a mistaken view of the lenders' role in the bond transaction. The hospital loans represent an obligation to repay the bond proceeds used by the hospitals in accordance with the purpose of the bond issue, not an *investment* by the lenders. Because lending to the hospitals is not an "investment of proceeds," no arbitrage issue arises out of that use.

Moreover, even if we were to consider the issue of "credit support" fees, characterizing them as interest to the lenders is immaterial to their characterization as an administrative cost incurred by petitioner to recompense the lenders for acting as agents in the transactions. Petitioner argues, and we agree, that the thrust of the "administrative costs" provision is to permit issuers of governmental obligations to break even economically. All of the amounts retained by the lenders, representing compensation for credit support services, can be viewed as petitioner's costs of issuing, carrying, and repaying the bonds, i.e., as administrative costs. Petitioner notes, and respondent concedes, that the lenders' position under petitioner's proposed bond issuance is economically equivalent to that of an issuer of a letter of credit.[13] In each case, the lender assures timely payment of debt service on governmental obligations, which is essential to the issuance and marketing of the obligations. Respondent agrees that letter-of-credit fees are costs of issuing and carrying governmental obligations because the credit enhancement ensures repayment of the bonds. Such fees for a letter of credit are administrative costs within the meaning of section 1.103-13(c)(5), Income Tax Regs. Petitioner has represented, and respondent has not disputed, that the lenders will receive an arm's-length fee for services rendered

---

[13]The parties agree that under the traditional arrangement to provide tax-exempt financing to governmental units and hospital organizations described in sec. 501(c)(3), the governmental unit would issue bonds and lend the proceeds, net of costs, directly to the hospitals. When necessary to improve the bonds' rating as in this case, credit support would be secured in the form of a direct pay or stand-by letter of credit from a bank. The net proceeds of the bonds would be lent directly to hospitals but the banks would either make payments on the bonds directly and seek reimbursement from the hospitals, or stand by to make payments in the event the hospital defaulted on its obligation.

Letters of credit generally have been used in short-term transactions. Banks are reluctant to commit themselves to letters of credit in long-term financings. Petitioner, however, found that certain lenders would provide long-term credit for its bond program at comparable cost if the transaction was structured as a formal loan of bond proceeds to the lender followed by a relending by the lender to the hospital. From the standpoint of all of the parties involved, the economic consequences are equivalent to those obtained through a direct-pay letter of credit.

to petitioner and the hospitals, just as if the lenders had instead issued letters of credit supporting the hospitals' payments. Respondent concedes that both the letter-of-credit program or petitioner's program produce the same economic results. The lenders assume the role of primary obligor with regard to payment on the bonds, and the primary obligor's solvency is central to the bond issuer's ultimate security.

The report of the Senate Finance Committee on the 1986 Act indicates that yield on bonds, in effect, should be adjusted to reflect the cost of "credit enhancement devices:"

> The bill retains the present-law rules under which bond insurance premiums are treated as interest [thereby increasing yield on the governmental obligations] if the bond insurance results in a reduction in the interest rate on the bonds. In addition, the committee intends that the Treasury Department amend its regulations and to [sic] permit the *same treatment for the costs of other credit enhancement devices* (e.g., letters of credit) when the cost of the credit enhancement reflects an arm's-length transaction. * * * [Emphasis added.]

S. Rept. 99-313, at 845 (1986). 1986-3 C.B. (Vol. 3) 845. The conference committee adopted the Senate's position. H. Rept. 99-841 (Conf.), at II-747 (1986), 1986-3 C.B. (Vol. 4) 747. We agree that the interest differential represents the cost of a credit enhancement device. The remainder of the lenders' compensation represents the costs of originating and servicing the hospital loans and is thus an administrative cost pursuant to section 1.103-13(c)(5), Income Tax Regs.

Respondent argues, however, that depending upon the form chosen, profoundly different results will be produced pursuant to section 103 and that petitioner is bound by the form it chose. The form of the transaction in this case has the same economic and legal effect as the form of transactions structured on direct pay letters of credit. We conclude that the bonds are not arbitrage bonds within the meaning of section 148, and we do not believe that the difference in form has any tax significance in this case. Petitioner's proposed bonds, therefore, will be exempt from tax pursuant to section 103(a).

To reflect the foregoing,

*Decision will be entered for the petitioner.*